349 F.2d 885
 Blue Sky L. Rep. P 70,683
MID-CONTINENT CASUALTY COMPANY, Honnold and Company, Inc.,
and Philip C. Honnold, Appellants,
v.
McALESTER AIRCRAFT, INC., a debtor corporation, in
possession under Chapter Xof the Bankruptcy Act, Appellee.
 No. 7933.
 United States Court of Appeals Tenth Circuit.
 July 7, 1965.
 
 John B. Hayes, Oklahoma City, Okl. (C. J. Watts and Looney, Watts, Looney, Nichols & Johnson, Oklahoma City, Okl., on brief), for appellants.
 James E. Grigsby, Oklahoma City, Okl. (Arnold B. Britton, Oklahoma City, Okl., on brief), for appellee.
 Before MURRAH, Chief Judge, and PHILLIPS and HILL, Circuit Judges.
 ORIE L. PHILLIPS, Circuit Judge.
 
 
 1
 McAlester Aircraft, Inc., the debtor corporation in a reorganization proceeding under Chapter X of the Bankruptcy Act (11 U.S.C.A. 501-676, inclusive), brought this action against Honnold and Company, Inc., an Oklahoma corporation, hereinafter called H & C, and Philip C. Honnold, hereinafter called Honnold, to recover commissions and expense allowances alleged to have been unlawfully charged and received on the sales of stock of the debtor by H & C, under an under writing agreement entered into between the debtor and H & C. It also sought judgment against Mid-Continent Casualty Company, as surety, on a broker-dealers' bond of H & C in the penal sum of $10,000, and, as surety, on an investment agent's bond of Honnold in the penal sum of $2,000. Each bond was given under the Oklahoma Securities Act (71 Okl.St.Ann. 1-504, inclusive).
 
 
 2
 H & C was a broker-dealer and Honnold was an investment agent, both licensed by the Oklahoma Securities Commission.
 
 The condition of each bond was:
 
 3
 '* * * if said Principal shall comply with the provisions of the said Oklahoma Securities Act and with all rules, regulations and order made pursuant thereto and all amendments thereto hereinafter enacted, and satisfy and discharge any judgment or decree that may be rendered against said Principal in a court of competent jurisdiction in a suit brought by any aggrieved person against the Principal in which it shall be found or adjudged that the said Principal, in any way, violated a provision of or any rule, regulation or order under the said Act, which violation caused or resulted in damage or injury to the party suing, then this obligation to be null and void, otherwise to be and remain in full force and effect.'
 
 
 4
 The trial court entered a summary judgment in the amount of $12,000 against the Casualty Company and $15,000 against H & C and Honnold.
 
 
 5
 On February 28, 1961, the debtor entered into an underwriting agreement with H & C by which the debtor agreed to sell to the public, through the underwriter as its exclusive agent, 50,000 shares of its Class A common capital stock at $10 per share, and H & C agreed to sell the entire offering of such stock within a stipulated period, or with an extension of such period provided for in the contract; and by which the debtor agreed to pay H & C as compensation for its services 'a commission of fifteen (15%) percent and five (5%) percent for advertising and selling expense on each share * * * so sold by the Underwriter' and H & C agreed to remit to the debtor the offering price, less such commission and expenses per share on the securities sold by it.
 
 
 6
 Tool and Equipment Company, hereinafter called T & E, was an Oklahoma corporation chartered on September 22, 1961. Honnold was secretary-treasurer of T & E. On November 30, 1961, T & E obtained a loan of $75,000 from Fidelity National Bank and Trust Company, hereinafter called the Bank. The terms of the loan, and the requirements made by the Bank with regard thereto, which are hereinafter set out, had been agreed to by Honnold and Carl Hiatt, president of the debtor. The loan was not made upon the credit of T & E. It had virtually no credit. On November 30, 1961, T & E transferred to H & C, by a check signed by Honnold as its treasurer and drawn on the Bank, the proceeds of such loan in the amount of $75,000. On the same date, H & C deposited the sum of $60,000 to the account of the debtor in such Bank. Simultaneously with the deposit of the $60,000 to the credit of the debtor, H & C delivered to the debtor a stock sales report showing sales to each of five individuals of 1,500 shares of such stock for the sum of $15,000, or a total sale to the five individuals of 7,500 shares for $75,000.
 
 
 7
 The individuals named in the report as purchasers of such stock in fact neither purchased such stock nor made any payment therefor. By letters written to Honnold, each had authorized the use of his name in the purchase or sale of Class A stock of the debtor, appointed Honnold as his attorney and proxy in all matters involving such stock, and expressly provided that the giving of such authority should not subject the giver thereof to any personal liability.
 
 
 8
 The stock records of the debtor do not reflect the issuance of any stock to such five individuals. In an affidavit filed by Honnold, he averred that the stock was made out in the names of such individuals, but was never delivered to them, was in fact delivered to the Bank as collateral to secure the loan, and that it was never the intention of H & C, Honnold, or the officers of the debtor that the stock should be delivered to anyone other than the Bank.
 
 
 9
 In accordance with the requirements of the Bank, as a condition to the granting of the loan to T & E, Honnold, Hiatt and W. L. Carter, who was vice-president of the debtor, each personally guaranteed payment of the note, the 7,500 shares of stock were pledged to the Bank to secure the payment of such loan, and the debtor executed and delivered to the Bank a writing, dated November 29, 1961, by which the debtor agreed to maintain in its account with the Bank at least $50,000 until the note was paid.[1]
 
 
 10
 In his affidavit Honnold further averred that the transactions referred to above were carried out with the knowledge and approval of the officers of the debtor, who were also members of the executive committee of the debtor, in order to improve the financial statement of the debtor, to show an increase in stock sales, which had been lagging for several months, and to 'close out a current stock issue authorization.'
 
 
 11
 On January 1, 1963, the Bank charged the debtor's deposit account with $50,000 and credited that amount on the principal of the note.
 
 
 12
 It is indubitably clear from the record that the individuals who consented to the use of their names in connection with the 7,500 share stock issue were mere straw men and puppets of Honnold and H & C; that no stock was in fact sold or delivered to them and they in nowise obligated themselves to purchase or pay for any of such 7,500 shares of stock; that it was intended that none of such stock should be issued to such individuals, but should be only pledged and delivered to the Bank as collateral security for the loan; and in fact that none of the 7,500 shares referred to in the sales report made by H & C to the debtor were in fact sold to anyone until after the loan and the requirements of the Bank with respect thereto had been fully consummated. It follows that at the time the loan arrangements were consummated and the Bank's requirements with respect thereto met, H & C had not sold any of the 7,500 shares of stock in accordance with the terms and provisions of the underwriting agreement and was not entitled to any commission or allowance for advertising and selling expenses with respect to such 7,500 shares of stock.
 
 
 13
 In his affidavit Honnold further averred that as payments were made on the loan, the Bank released portions of the collateral stock, which were sold to numerous purchasers. It is a fair inference from the record as a whole that such payments were made from moneys derived from sale of the released collateral stock, and that collateral stock equivalent to the payments made, on the basis of $10 per share, was released by the Bank. However, the record does not show the total amount of the payments so made or the number of shares of stock so released. Honnold's affidavit was indefinite in that respect. Counsel for the appellants assert in their brief that such payments discharged $25,000 of the principal of the loan, prior to the time the Bank charged $50,000 of the principal of the note against the debtor's account. Counsel for the debtor assert in their brief that no payments on the principal of the note had been made at the time of the $50,000 charge to the debtor's account. However, at the pretrial the debtor did not deny Honnold's averment that some payments had been made on the principal from the proceeds of the sale of collateral stock, prior to the time the $50,000 was charged against its account.
 
 
 14
 Whether or not the 5,000 shares of the collateral stock and the other shares of the collateral stock remaining unsold, if any, were returned to the debtor when the $50,000 was charged to its account by the Bank does not appear from the record. Counsel for the appellants in their brief assert that all the unsold shares of such stock were returned to the debtor, and counsel for the debtor in their brief deny that fact.
 
 
 15
 As the net result of the transaction, the debtor actually received only $10,000 of the proceeds of the loan and parted with either 2,500 shares of its stock, or such part thereof as was sold by H & C, after the loan had been fully consummated, and the unsold shares of collateral stock retained by the Bank, if any, when the debtor's deposit was applied on the principal of the loan.
 
 
 16
 It is clear from the record that T & E was a mere puppet of Honnold and H & C, and that if 2,500 shares of the collateral stock, or any part thereof, were in fact sold to the public and the proceeds therof applied on the principal of the loan to secure the release of an equivalent amount of collateral stock, that such sales were made and transactions carried out by H & C and Honnold. Indeed, counsel for appellants assert in their brief that if H & C is liable for the return of the $15,000 commission, then it is entitled to a credit of $5,000 for commission and expenses on the sales of 2,500 shares of the collateral stock made by it, thus in effect asserting that the sales made of the collateral stock were in fact made by H & C. If such sales were made by H & C, then under the underwriting agreement it earned a commission and advertising and expense allowance aggregating 20 per cent of the sales proceeds.
 
 
 17
 If in fact H & C sold 2,500 shares of the collateral stock released by payments on the loan, then the debtor would be entitled to recover from H & C $10 per share or $25,000, less the $10,000 the debtor realized from the loan, and also less $5,000 commission and advertising and selling expenses, which H & C would be entitled to under the underwriting agreement. If H & C sold less than 2,500 shares of the collateral stock so released by payments on the loan, the debtor would be entitled to recover from H & C $10 per share for each share of such stock so sold, and H & C's credit for commission and expenses would be reduced to 20 per cent of $10 per share for each share of the stock sold. However, if any of such unsold collateral stock was not released by the Bank and returned to the debtor when its $50,000 deposit was applied on the loan, then the aggregate of such credits to which H & C would be entitled would be reduced in the amount of $10 per share for each share of unsold collateral stock not so returned to the debtor.
 
 
 18
 Counsel for H & C and Honnold assert that all of the officers of the debtor had full knowledge of the facts with respect to the loan, the transactions carried out in the consummation thereof and the disbursement of the proceeds of the loan, and fully consented thereto and approved thereof; and that the purposes of such loan and the transactions in connection therewith were to benefit the debtor by improving its financial balance sheet and by showing an increase in stock sales, which had been lagging. They contend, therefore, that the several transactions were fairly susceptible of a construction that would free H & C and Honnold from any imputation of fraud and hence it was error to grant a summary judgment against Honnold and H & C. We need not resolve that contention, because, as we have indicated above, irrespective of whether H & C and Honnold were guilty of fraud, H & C was not entitled to any commissions and advertising and sales expenses on the pretended, but wholly fictitious sale of 7,500 shares of stock reported by it, and the debtor was entitled to recover from H & C on the basis of $10 per share for the shares of collateral stock released by payments on the loan and sold by H & C subsequent to the consummation of the loan, less the net credits which H & C may be entitled to, as above set out.
 
 
 19
 Since the amount of such subsequent sales of collateral stock and the amount of the proceeds therefrom applied on the loan were not established on the record at the time of the pretrial proceedings, but were in dispute, as was whether any of the unsold shares of collateral stock were not returned to the debtor when its $50,000 deposit was applied on the principal of the loan, and since the evidence may establish other possible pertinent factors, it is clear that the case was not ripe for summary judgment.
 
 
 20
 We turn now to the question of liability on the bonds.
 
 
 21
 Section 202(e) of the Oklahoma Securities Act (71 Okl.St.Ann. 202) provides that the bond shall be 'conditioned that the registrant will comply with the provisions of this act.'It seems clear to us that under 202(e) and the condition of the bonds, itself, the principal and surety are liable thereunder, only if the principal has violated a provision of the Oklahoma Securities Act[2] and such violation has caused damage or injury to a person for whose benefit the bond was given.
 
 
 22
 Counsel for the debtor say that the stock sales report made by H & C constituted a false statement under 18 Okl.St.Ann. 1.176 and a violation of such section, but 1.176 is a part of the Oklahoma Business Corporation Act and is not a provision of the Oklahoma Securities Act. Clearly, a violation thereof would not be a violation of the Oklahoma Securities Act within the meaning of the condition of the bonds.
 
 
 23
 Counsel for the debtor contend that under the facts shown by the record, H & C and Honnold violated the provisions of 101 and 102 of the Oklahoma Securities Act (71 Okl.St.Ann. 101, 102).
 
 
 24
 We think the purpose of 101, supra, the text of which is set out in marginal note 3,[3] was to protect the buyer of securities from fraud practiced upon him by the seller, and the seller of securities from fraud practiced upon him by the buyer, by force of sanctions which may be imposed under the administrative provisions of the Act, or by injunction or criminal prosecution.[4] We do not think it was intended to provide a private civil remedy for the collecting or withholding of commissions on sales in fact not made and therefore not earned under an underwriting contract by the underwriter, even though such collecting or withholding operated as a fraud on the seller.
 
 
 25
 Section 102, supra, in part here material, is set out in marginal note 5.[5] It will be observed that 102 is limited to fraud practiced by an investment adviser upon another person, in advising such other person as to the value of securities or their purchase or sale, when the adviser had received consideration for such advice from such other person, and clearly has no application to the alleged fraud of H & C and Honnold in the instant case.
 
 
 26
 We conclude, therefore, that there was no violation of the condition of the bonds by the respective principals therein, and that the court erred in granting judgment in favor of the debtor on the bonds for $12,000.
 
 
 27
 The cause is remanded, with instructions to vacate the summary judgments, and for further proceedings in accordance with the views herein expressed.
 
 
 
 [1]
 The last-mentioned writing in part read as follows:
 'In consideration of a $75,000 loan to Tool & Equipment Co. of which we will receive $60,000, we agree to maintain in our account at least $50,000 and upon the maturity of said loan to purchase not more than 5,000 shares or the balance of said shares of the Class A Common Stock of McAlester Aircraft, Inc. whichever is the largest. This stock which is the collateral on said note will be the last or remaining stock of the balance of the entire note, and our agreement is that there will be a balance of cash maintained in our account in your bank equivalent to the number of shares collateral remaining on said note at $10.00 per share. In other words for every $10.00 applied on the principal of said note, 1 share of the collateral will be released, and after the note is paid down to $50,000 with 5,000 shares collateral, then for every $10.00 paid on the principal of said note, the required balance in the account of McAlester Aircraft, Inc. will be reduced $10.00. * * *'
 
 
 [2]
 No violation of a rule or regulation is asserted by the debtor
 
 
 [3]
 '101. Sales and purchases.--
 'It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly
 '(1) to employ any device, scheme, or artifice to defraud,
 '(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading,
 '(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. Laws 1959, p. 329, 101.'
 
 
 [4]
 See comments on the Uniform Securities Act, Handbook of the National Conference of Commissioners on Uniform State Laws, 1956, pp. 182-183
 
 
 [5]
 '102. Advisory activities.--
 '(a) It is unlawful for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise,
 '(1) to employ any device, scheme, or artifice to defraud the other person, or
 '(2) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person.'